Argued and submitted March 3, the judgment of the Tax Court affirmed
August 20, 1992

# CROCKER EQUIPMENT LEASING, INC.,
*Respondent,*

*v.*

# DEPARTMENT OF REVENUE,
State of Oregon,
*Appellant.*

## (OTC 2973; SC S38059)

838 P2d 552

Marilyn J. Harbur, Assistant Attorney General, Salem, argued the cause for appellant. With her on the briefs was Dave Frohnmayer, Attorney General, Salem.

Roy E. Crawford, of Brobeck, Phleger & Harrison, San Francisco, California, argued the cause for respondent. With him on the brief was Craig R. Berne, San Francisco, California.

GRABER, J.

## GRABER, J.

The Department of Revenue (Department) appeals from a judgment of the Oregon Tax Court concerning Oregon corporate excise taxes owed by taxpayer Crocker Equipment Leasing, Inc. (CELI), a California corporation, for the years 1978 through 1980. CELI challenged the Department's assessment, contending that the formula that the Department used to apportion CELI's Oregon business income did not fairly represent the extent of its business activity in this state. The Tax Court agreed with CELI and ordered a refund. *Crocker Equipment Leasing, Inc. v. Dept. of Rev.*, 12 OTR 16 (1991). We review *de novo*, ORS 305.445, 19.125(3), and affirm the judgment of the Tax Court.

CELI and the Department stipulated to the following facts:[1]

"1.     During the three tax years (calendar years 1978, 1979, and 1980) Crocker Equipment Leasing, Inc. ("CELI") was a California Corporation engaged in the business of owning, leasing and financing tangible personal property. CELI was a 100% owned subsidiary of Crocker National Bank, a U.S. chartered national bank engaged in virtually all aspects of normal banking activities. Crocker National Bank was headquartered in California. Crocker National Bank was a subsidiary of Crocker National Corporation, a holding company incorporated in the laws of Delaware and registered under the Bank Holding Company Act of 1956, as amended, 12 USC §§ 1841 et seq. Both Crocker National Corporation and Crocker National Bank owned other subsidiaries * * *.

"2.     Crocker National Bank and its subsidiaries were engaged in the business of banking as authorized by 12 USC § 24 (Seventh).[2] * * *

"3.     The only corporation engaged in business in Oregon and required to file an Oregon corporate excise tax return for 1978, 1979 and 1980 was CELI.

---

[1] Because of the parties' stipulation, our fact-finding role in this case is limited. In any event, this court's factual decisions as a finder of fact on *de novo* review of the record made in the Tax Court have no precedential value. *United Telephone Co. v. Dept. of Rev.*, 307 Or 428, 431, 770 P2d 43 (1989); *Bend Millwork v. Dept. of Revenue*, 285 Or 577, 581-82, 592 P2d 986 (1979).

[2] During the years 1978 through 1980, 12 CFR § 7.7376 authorized an operating subsidiary of a national bank to "lease property."

"4.    The original tax returns filed in Oregon by CELI for 1978, 1979, and 1980 were prepared on a separate return basis. On audit the Department of Revenue determined that CELI was part of a unitary group headed by Crocker National Corporation. CELI agrees with this determination, and that the Oregon taxable income of CELI should be a fairly apportioned part of the combined income of this unitary group. The disagreement between CELI and the Department of Revenue is whether the apportionment method applied by the Department of Revenue fairly represents the activity conducted by CELI in Oregon or in the alternative, is constitutional.

"5.    CELI filed its California corporate franchise (income) tax returns for the taxable years 1978, 1979, and 1980 on a combined unitary basis including the corporations treated as unitary by the Oregon Department of Revenue (DOR). These returns were used by the DOR as a source for information to determine income subject to apportionment, and the denominators of the property, payroll and sales factors. These numbers were modified for Oregon tax purposes because of differences in reporting income to the two states and to reflect federal audit adjustments. * * * Defendant disputes the relevance of California's treatment of intangibles in the property factor.

"* * * * *

"7.    During 1978 through 1980 CELI leased a broad spectrum of tangible personal property to business lessees, including transportation equipment (such as trucks, tractors, airplanes, vessels, barges, and passenger car fleets), manufacturing, retail, mining, agricultural, and office equipment. A small number of vehicles were leased on an individual basis as an accommodation to clients.

"Normally the leased property was sold at the end of the lease either to the lessee or to another person. In a few instances the property would again be released to another lessee. Leases of vehicles were 'closed-end' leases whereby the lessee agreed to lease for an agreed upon number of months and guaranteed a lump sum payment at the end of the lease.

"Many of the leases generated a federal investment tax credit. In some cases CELI claimed the credit; in other leases CELI agreed to elect to pass on the credit to its lessees. Appropriate rental rate adjustments would be made to

account for whether the lessor or the lessee took the investment tax credit.

"CELI obtained new leases both (1) by purchase from other corporations such as leasing companies or banks that originated a lease transaction, and (2) by originating a new lease itself. CELI maintained its principal offices in California, and did not have an office, telephone listing, or mail drop in Oregon. CELI did not have any employees based in Oregon, but on occasion a CELI employee from California or the Seattle office of CELI may have visited a client in Oregon.

"In all cases lease documents were executed by CELI in California. All credit decisions were made in California, including evaluation of the credit worthiness of the prospective lessee. Appraisals of the equipment proposed to be leased were made in California, including estimates of value at the outset, during the term, and at the termination of the lease. All funds were advanced by CELI in California. All administration of existing leases was done in California. Payments were received by CELI in California.

"The original cost of leased property owned by CELI and located in Oregon was $7,643,298 in 1978, $7,212,021 in 1979, and $5,977,672 in 1980. Rental receipts were $1,431,829 in 1978, $1,410,299 in 1979, and $1,142,757 in 1980. In addition, CELI received interest on transactions classified for federal and state income tax purposes as installment sales contracts from Oregon customers in the amount of $96,802 in 1978, $195,812 in 1979, and $195,913 in 1980.

"8.    The Department of Revenue determined that CELI's apportioned income in Oregon was $319,715 in 1978, $361,435 in 1979, and $295,701 in 1980, resulting in tax of $23,979 in 1978, $27,108 in 1979, and $22,178 in 1980.

"9.    If intangible personal property were included in the property factor, CELI's apportioned income in Oregon would be $54,652 in 1978, $60,669 in 1979, and $48,759 in 1980, resulting in tax of $4,099 in 1978, $4,550 in 1979, and $3,657 in 1980.

"10.    The Department of Revenue applied the following apportionment factors to CELI:

|  | 1978 | 1979 | 1980 |
|---|---|---|---|
| Receipts | .123% | .093% | .061% |
| Payroll | 0% | 0% | 0% |
| Property | .931% | .748% | .502% |
| Average | .351% | .280% | .188% |

"11. If intangible property were included in the denominator of the property factor, the apportionment factors would be as follows:

|  | 1978 | 1979 | 1980 |
|---|---|---|---|
| Receipts | .123% | .093% | .061% |
| Payroll | 0% | 0% | 0% |
| Property | .056% | .046% | .033% |
| Average | .060% | .046% | .031%" |

The parties also incorporated into their stipulation a number of documents, including CELI's California corporate franchise tax returns for tax years 1978, 1979, and 1980 and Forms 10-K (Annual Reports under Sections 13 or 15(d) of the Securities Exchange Act of 1934) of Crocker National Corporation (Crocker) for 1978, 1979, and 1980.

Generally, the Uniform Division of Income for Tax Purposes Act (UDITPA), ORS 314.605 to 314.670, prescribes the method for determining how much of a taxpayer's national or worldwide income is allocable to its Oregon business activities. *Pacific Coca-Cola Bottling Co. v. Dept. of Rev.*, 307 Or 667, 669 & n 2, 773 P2d 1290 (1989). In the relevant tax years, ORS 314.650 provided:

"All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three."

In *Twentieth Century-Fox Film v. Dept. of Rev.*, 299 Or 220, 224, 700 P2d 1035 (1985), this court explained how the three-factor formula operates:

"Dollar values are assessed to each of three aspects of taxpayer's business: property, sales and payroll. Each of these factors is a fraction. The numerator of each fraction is the Oregon portion of the value and the denominator is the total value everywhere. Each fraction is rendered [as] a percentage. The three percentages are added together and divided by three. The resultant percentage represents the extent of taxpayer's business in Oregon. It is multiplied by taxpayer's income during the tax year to determine the Oregon taxable income. The resultant dollar figure * * * is multiplied by the applicable excise tax rate to determine the amount taxpayer must pay."

The statutory structure applicable in this case is slightly more complicated, because the parties agree, as do we, that the unitary business of which CELI is a part is a financial organization. Financial organizations are excluded, by ORS 314.615, from the coverage of UDITPA. ORS 314.615 provides in part:

> "Any taxpayer having income from business activity which is taxable both within and without this state, *other than activity as a financial organization* * * *, shall allocate and apportion the net income of the taxpayer as provided in ORS 314.605 to 314.675. *Taxpayers engaged in activities as a financial organization* * * * *shall report their income as provided in ORS 314.280* * * *." (Emphasis added.)

ORS 314.280 provides for a method of apportioning income for taxpayers that are financial organizations and authorizes the Department to adopt regulations. Notwithstanding the legislature's express exclusion of financial organizations from UDITPA, the Department, by regulation, applies the UDITPA three-factor apportionment formula to financial organizations, except that a "gross revenues" factor is used in place of the "sales" factor. OAR 150-314.280(E). In this court, taxpayer does not challenge the Department's authority to promulgate OAR 150-314.280.[3]

To compute each apportionment factor, OAR 150-314.280(F) incorporates by reference the UDITPA methodology used to determine the property (ORS 314.655), payroll (ORS 314.660), and sales (ORS 314.655) factors of nonfinancial businesses. In this case, the parties agree on all factors except the property factor. The property factor is computed as follows:

> "(1)   The property factor is a fraction, the numerator of which is the average value of the taxpayer's real and tangible personal property owned or rented and used in this state during the tax period and the denominator of which is the average value of all the taxpayer's real and tangible personal property owned or rented and used during the tax period.

---

[3] Taxpayer did challenge the validity of those regulations in its complaint to the Tax Court. In responding to the Department's appeal, however, taxpayer does not argue for affirmance on this alternative ground, and we therefore assume the validity of the regulations.

"(2)  Property owned by the taxpayer is valued at its original cost. Property rented by the taxpayer is valued at eight times the net annual rental rate. Net annual rental rate is the annual rental rate paid by the taxpayer less any annual rental rate received by the taxpayer from subrentals.

"(3)  The average value of property shall be determined by averaging the values at the beginning and ending of the tax period but the department may require the averaging of monthly values during the tax period if reasonably required to reflect properly the average value of the taxpayer's property." ORS 314.655.

CELI maintains that intangible property must be included in the property factor to avoid distortion. Its position rests primarily on the nature of the unitary business. CELI asserts: Crocker's business is banking; its basic function is to loan money on which it earns interest; about 98 percent of Crocker's earning assets[4] are intangibles; and even CELI's leases of equipment represent an alternative form of financing although they involve tangible property.

The Department did not include intangibles in the property factor. The Department asserts that using only tangible property does not produce a disproportionate result, because the gross revenues factor reflects the interest income earned by intangibles.

ORS 314.280, which applies to financial organizations, provides an avenue of relief for taxpayers who allege that the statutory formula does not fairly represent their Oregon business activity. ORS 314.280 provides:

"(1)  If a taxpayer has income from business activity as a financial organization * * * which is taxable both within and without this state * * *, the determination of net income shall be based upon the business activity within the state, and the department shall have power to permit or require either the segregated method of reporting or the apportionment method of reporting, under rules and regulations adopted by the department, so as fairly and accurately to reflect the net income of the business done within the state.

---

[4] CELI uses the term "earning assets" to refer to property that produces income, such as loans and equipment that CELI leases to others. Other property, such as cash on hand and bank premises, is not included in CELI's use of the term "earning assets." If all property is considered, tangible property represented about 3 percent of Crocker's property in the relevant tax years.

"(2) The provisions of subsection (1) of this section dealing with the apportionment of income earned from sources both within and without the State of Oregon are designed to allocate to the State of Oregon on a fair and equitable basis a proportion of such income earned from sources both within and without the state. Any taxpayer may submit an alternative basis of apportionment with respect to the income of the taxpayer and explain that basis in full in the return of the taxpayer. If approved by the department that method will be accepted as the basis of allocation."

In the relevant tax years, OAR 150.214.280(I) incorporated, for financial organizations, the regulation for nonfinancial businesses, OAR 150-314.670(A), which was promulgated under ORS 314.670 (1977). OAR 150-314.670(A) provided in part:

"ORS 314.670 provides that if the allocation and apportionment provisions of ORS 314.610 to 314.665 do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the Department may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

"(1) Separate accounting;

"(2) The exclusion of any one or more of the factors;

"(3) The inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or

"(4) The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

"ORS 314.670 permits a departure from the allocation and apportionment provisions of ORS 314.610 to 314.665 only in limited and specific cases. ORS 314.670 may be invoked only in specific cases where unusual fact situations (which ordinarily will be unique and nonrecurring) Produce [sic] incongruous results under the apportionment and allocation provisions contained in ORS 314.610 to 314.665."[5]

---

[5] ORS 314.670 and OAR 150-314.670 have been amended to permit these alternative methods of allocation and apportionment "only where unusual fact situations (which ordinarily will be unique and nonrecurring) produce results which violate a taxpayer's rights under the constitution of Oregon or of the United States." OAR 150-314.670. That amendment is not retroactive, and we express no view concerning it.

In the present case, the Tax Court found that "use of only tangible property in the property factor in this case results in a disproportionate apportionment of income to Oregon." *Crocker Equipment Leasing, Inc. v. Dept. of Rev., supra*, 12 OTR at 21. The Tax Court also found that CELI's suggested alternative of including intangibles in the property factor was reasonable, because it "results in an apportionment which fairly and accurately reflects plaintiff's business activity within the state." *Id.* at 23.

■  Taxpayer has the burden of proving, by a preponderance of the evidence, that the statutory apportionment formula does not fairly represent the extent of taxpayer's business activity in Oregon. ORS 305.427; ORS 314.280; *Twentieth Century-Fox Film v. Dept. of Rev., supra*, 299 Or at 225, 237. In *Twentieth Century-Fox*, this court discussed what a taxpayer seeking to deviate from the statutory three-factor apportionment formula must prove:[6] First, the taxpayer must demonstrate that "the statutory formula as a whole does not 'fairly represent the extent of the taxpayer's business activity in this state.' " 299 Or at 233. Second, the taxpayer must establish that its alternative method of allocating income is reasonable. *Ibid.*

■  The first question, then, is whether taxpayer demonstrated, by a preponderance of the evidence, that the statutory formula as a whole does not fairly represent the extent of its business activity in Oregon. Taxpayer presented the testimony of Sandra B. McCray, whom it qualified as an expert on state taxation of the banking industry.[7] She testified that, based on her knowledge of banks in general, using a property factor that omits intangibles does not reasonably reflect how the income is generated for a bank, because a bank's income is

---

[6] *Twentieth Century-Fox Film v. Dept. of Rev., supra*, interpreted the UDITPA formula for nonfinancial businesses. As noted above, the Department's regulations for financial organizations incorporate the UDITPA formula, and we assume the validity of those regulations in this case.

[7] McCray had worked for the Multistate Tax Commission to develop a new method for state taxation of banks. She also has been a member of the Colorado State Banking Board, a Director of the New York Legislative Tax Study Commission, an author of the report by the Federal Advisory Commission on Intergovernmental Relations on state taxation of banks, and a consultant to the states of Massachusetts, Nevada, and New York concerning state banking laws.

generated mainly through intangibles. McCray further testified that about 98 percent of Crocker's earning assets[8] are intangibles and that excluding intangibles from the denominator of the property factor in this case did not fairly reflect taxpayer's business activity in Oregon. She testified that excluding intangibles in this case yielded a "grossly distorted" result.

We find in accordance with McCray's testimony. There was no evidence to the contrary.

The Department counters that using only tangible property in the *property* factor does not produce a disproportionate result, because the *gross revenues* factor adequately reflects the interest income earned by intangibles.[9] We disagree. Each factor in the formula is weighted equally; the three-factor formula " 'has the built-in assumption that one-third of the net income is derived from the use of property, one-third from services and one-third from selling.' " 12 OTR at 21 n 4 (quoting W. Beaman, Paying Taxes To Other States 3.15 (1963)). Including interest income from intangibles in the gross revenues factor does not correct the extremely disproportionate representation of business activity caused by excluding intangibles from the property factor. As the stipulated facts show, exclusion of intangibles from the property factor increases that factor about 16 times and increases the average of the three apportionment factors about 6 times.

We agree with the Tax Court that "[t]he unitary income which is being apportioned is the income of a large bank, 98 percent of which is attributable to loans or intangible property." 12 OTR at 21. To exclude that 98 percent from the property factor does not fairly represent CELI's, as part of the unitary Crocker organization's, business activity in Oregon. The Department's formula as a whole does not fairly represent the extent of CELI's business activity in this state.

■ The second question is whether CELI's proposed alternative of including intangibles in the property factor is a

---

[8] McCray used the term "earning assets" in the same sense as CELI does. *See* note 3, *supra*.

[9] The gross revenues factor includes "all income, including interest, fees, service charges, discounts, gains from sale of assets and miscellaneous income." OAR 150-314.280(E).

reasonable method of apportioning income. Reasonableness in this context has three components:

"(1) the division of income fairly represents business activity and if applied uniformly would result in taxation of no more *or* no less than 100 percent of taxpayer's income; (2) the division of income does not create or foster lack of uniformity among UDITPA jurisdictions; and (3) the division of income reflects the economic reality of the business activity engaged in by the taxpayer in Oregon." *Twentieth Century-Fox Film v. Dept. of Rev., supra,* 299 Or at 233-34 (emphasis in original).

The first component of our inquiry is whether taxpayer's proposal fairly represents business activity and, if applied uniformly, would result in taxation of neither more nor less than 100 percent of the business's activity. McCray testified that including intangibles in the property factor yields a property factor that bears a realistic relationship to how the income is earned. CELI also introduced the testimony of James Brown, a Department employee, to the Multistate Tax Commission, in which he agreed that, for financial organizations, intangibles should be included in the property factor in order to reflect properly the business activity of banks. We find that including intangibles in the property factor properly reflects business activity. The Department does not dispute that taxpayer's proposed formula, *if* applied uniformly, would result in taxation of neither more nor less than 100 percent of the business's activity.

The second component of the inquiry into the reasonableness of taxpayer's proposal is whether the division of income creates or fosters lack of uniformity among jurisdictions. McCray testified that, in the relevant tax years, state taxation of banks was "chaos," with states using 32 different methods of apportioning state banks' income. McCray further testified that many states did not apportion income of banks at all and that many had no formal guidelines. She stated that the Multistate Tax Commission had proposed a regulation, which would include intangibles in the property factor, as a move toward uniformity. CELI also introduced evidence that California, Crocker's domicile, included intangibles in the property factor. We find that using taxpayer's proposed formula would not create or foster any greater lack

of uniformity among jurisdictions than already exists, and might even reduce it somewhat.

The third component of the inquiry is whether including intangibles reflects the economic reality of the business activity engaged in by the taxpayer in Oregon. Including intangibles would reflect economic reality for the same reasons that excluding intangibles fails to reflect economic reality.

CELI has met its burden of proving both that the Department's formula is inadequate and that CELI's alternative formula is reasonable. We so find.

The judgment of the Tax Court is affirmed.